[No. 65294-5. En Banc.]
Argued March 10, 1998. Decided July 9, 1998.

THE CONFEDERATED TRIBES OF THE CHEHALIS RESERVATION, ET AL., *Appellants*, v. JAMES M. JOHNSON, ET AL., *Respondents*.

MADSEN, ALEXANDER, and SANDERS, JJ., dissent in part by separate opinion.

*Mathews, Garlington-Mathews & Chesnin,* by *Harold Chesnin; James B. Weber* of the *Swinomish Tribal Community Office*; and *Kevin R. Lyon* and *Ronald J. Whitener* of the *Squaxin Island Tribe Legal Department,* for appellants.

*James M. Johnson* pro se.

*Christine O. Gregoire, Attorney General,* and *Jonathan T. McCoy, Assistant,* for respondents Gambling Commission and Frank Miller.

GUY, J. — At issue in this case is whether State Gambling Commission records showing the amount of the "community contribution" paid by an Indian tribe, under the terms of a tribal-state gaming compact, are subject to

disclosure under the public records act, RCW 42.17.250-.348. We hold that the records are not protected from disclosure under any provision of state or federal law and, accordingly, we affirm the trial court order requiring the Gambling Commission to comply with the public records request.

## BACKGROUND/FACTS

Appellants are four Indian tribes (Tribes) which conduct casino-style gambling operations on reservation lands located in the state of Washington.[1]

Gambling on Indian reservations is heavily regulated by tribal, state and federal law. *See* 25 U.S.C. §§ 2701-2721; RCW 9.46.300.

In 1988 Congress passed the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701-2721, in order to provide a statutory framework for the operation and regulation of gambling activities conducted by Indian tribes.[2] 25 U.S.C. § 2702; *Seminole Tribe v. Florida*, 517 U.S. 44, 48, 116 S. Ct. 1114, 134 L. Ed. 2d 252 (1996).

The IGRA divides gambling, or gaming, into three classes. Class I gaming includes social games played solely for prizes of minimal value, or traditional forms of Indian gaming which are played as a part of or in connection with tribal ceremonies or celebrations. 25 U.S.C. § 2703(6). These activities are within the exclusive regulatory jurisdiction of the Indian tribes. 25 U.S.C. § 2710(1). Class II gaming includes games of chance, such as bingo and certain card games. 25 U.S.C. § 2703(7). These are regulated by the

---

[1] Appellants are the Confederated Tribes of the Chehalis Reservation, the Upper Skagit Indian Tribe, the Swinomish Indian Tribal Community, and the Squaxin Island Tribe.

[2] The IGRA was enacted in response to *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S. Ct. 1083, 94 L. Ed. 2d 244 (1987), a decision in which the Supreme Court severely limited the power of states to apply their gambling laws to Indian gaming. *See Keweenaw Bay Indian Community v. United States*, 136 F.3d 469 (6th Cir.), *cert. denied*, 119 S. Ct. 335 (1998); *Confederated Tribes of Siletz Indians v. United States*, 110 F.3d 688, 692 (9th Cir.), *cert. denied*, 522 U.S. 1027 (1997). *See also* Joseph M. Kelly, *Indian Gaming Law*, 43 DRAKE L. REV. 501, 502-04 (1995).

tribes and according to the provisions of the IGRA. 25 U.S.C. § 2710. Class III gaming is defined as "all forms of gaming that are not class I gaming or class II gaming." 25 U.S.C. § 2703(8). Class III gaming includes such activities as blackjack, roulette, craps, slot machines, horse racing, keno, table games, and sports pools.

The IGRA provides that class III gaming on Indian lands is legal only if it is: (1) authorized by a valid tribal ordinance or regulation; (2) located in a state that permits such gaming; and (3) conducted in conformance with a tribal-state compact. 25 U.S.C. § 2710(d)(1); *Seminole Tribe*, 517 U.S. at 48-49. The tribal-state compact, which must be approved by the Secretary of the Interior, 25 U.S.C. § 2710(d)(3)(B), may include provisions relating to the following:

> (i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

> (ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

> (iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;

> (iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;

> (v) remedies for breach of contract;

> (vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and

> (vii) any other subjects that are directly related to the operation of gaming activities.

25 U.S.C. § 2710(d)(3)(C).

Each of the tribes involved in this appeal has entered into a compact with the State of Washington. The compacts

all recognize that it is this state's policy to highly regulate and strictly limit gambling activities.[3]

Each of the compacts involved here also provides for an assessment, or impact fee, to be paid by the Tribes to defray nontribal, local agency costs of providing law enforcement and emergency services and other services, such as transportation and highway maintenance. The assessments, called "community contributions" in the compacts, are to be in the amount of two percent of the compacting tribe's "net win" from class III gaming activities.[4] The compacts all contain paragraphs that state in essence:

> The Tribe recognizes that adequate enforcement and the availability of support services and assistance is critical to the safe operation of the gaming activities and that activities directly and indirectly associated with the operation of gaming facilities on the . . . Reservation may impact surrounding local law enforcement and other local governmental service agencies, and place an increased burden on them. To that end, the Tribe hereby agrees to establish a fund for [the] purpose of provid-

[3]The state gambling act, RCW 9.46, begins with a legislative declaration, which states in part:

> The public policy of the state of Washington on gambling is to keep the criminal element out of gambling and to promote the social welfare of the people by limiting the nature and scope of gambling activities and by strict regulation and control.

> It is hereby declared to be the policy of the legislature, recognizing the close relationship between professional gambling and organized crime, to restrain all persons from seeking profit from professional gambling activities in this state; to restrain all persons from patronizing such professional gambling activities; to safeguard the public against the evils induced by common gamblers and common gambling houses engaged in professional gambling; and at the same time, both to preserve the freedom of the press and to avoid restricting participation by individuals in activities and social pastimes, which activities and social pastimes are more for amusement rather than for profit, do not maliciously affect the public, and do not breach the peace.

> . . . .

> All factors incident to the activities authorized in this chapter shall be closely controlled, and the provisions of this chapter shall be liberally construed to achieve such end.

RCW 9.46.010.

[4]"Net win" is defined in the compacts as the difference between the total amount wagered or played and the amounts repaid to winners.

ing assistance to non-tribal local law enforcement, emergency services and/or other local governmental service agencies (including those agencies responsible for traffic and transportation) impacted by the Class III gaming facility and to withhold and disburse 2.0% of the Net Win from Class III gaming operation . . . for this fund ("Community Contribution").

Clerk's Papers at 316-17 (Squaxin Island compact). (The compacts of the other Appellant Tribes contain substantially similar language.)

The community contribution is paid into a fund which is administered and distributed by a committee composed of representatives from the State Gambling Commission, the tribe, and nontribal, local agencies which are impacted by the Indian tribe's gambling operation.

It is the amount of these community contributions, as reflected in Gambling Commission records, that was requested in this case.

On December 9, 1996, Respondent James M. Johnson filed a public disclosure request with the Gambling Commission. The request was for:

All reports or other documents showing the amounts of money paid or dispersed [sic] as community contributions, or accrued into a fund for that purpose from any Washington Indian Tribe engaged in gaming, for the period 1991 to the present.

Clerk's Papers at 9.

The Gambling Commission's position, since the time of the request, has been that the records requested by Mr. Johnson are "public records" and are subject to disclosure under the public records act. However, the Gambling Commission did not immediately release the records. Instead, it notified each tribe having a compact with the State of the request, in order to give the tribes an opportunity to request an injunction to prevent the Gambling Commission from releasing the records. Only the Appellant Tribes

objected to the release of the records.[5] These Tribes filed actions in Thurston County Superior Court, pursuant to RCW 42.17.330, requesting injunctive relief, and Mr. Johnson filed a cross complaint asking for an order requiring the records be disclosed.

After considering memoranda and documents submitted by the parties, and following oral argument, the trial court ordered the Gambling Commission to disclose the records as requested by Mr. Johnson. Although the trial court denied a motion for stay, it delayed the effective date of the order in order to give the Tribes time to appeal.

The Tribes did appeal, and a motion for stay of the trial court order was granted by the Court of Appeals Commissioner. Respondent Johnson moved to modify the ruling granting a stay and the Court of Appeals granted his motion, lifting the stay. The Tribes then filed a petition for discretionary review of the Court of Appeals order and moved, in this court, for an emergency stay. This court stayed the trial court order and, on its own initiative, accepted review on the merits of the appeal.

## ISSUES

1. Are the State Gambling Commission records showing "community contributions" paid pursuant to tribal-state gaming compacts "public records" which are subject to disclosure under the public records act?

2. Has the State agreed, under the terms of the tribal-state gaming compacts, that the requested information will not be disclosed?

3. Does federal law prevent the disclosure of state re-

---

[5]The other tribes having compacts with the State did not object, and the information regarding community contributions from those tribes was released to Mr. Johnson. The documents provided are sparsely worded to show only the total amount of the two percent community contribution in one year, the amount distributed, and the fund balance.

cords showing community contributions paid pursuant to tribal-state gaming compacts?

## ANALYSIS

■■ Because this case presents a question of law which was decided by the trial court solely on the basis of documentary evidence and legal arguments, review is de novo. *Amren v. City of Kalama*, 131 Wn.2d 25, 32, 929 P.2d 389 (1997); *Spokane Police Guild v. Liquor Control Bd.*, 112 Wn.2d 30, 35-36, 769 P.2d 283 (1989). The parties seeking to prevent disclosure—in this case the Tribes—bear the burden of proof. *Spokane Police Guild*, 112 Wn.2d at 35; *Ames v. City of Fircrest*, 71 Wn. App. 284, 857 P.2d 1083 (1993).

■ The Gambling Commission initially argues that the Tribes should not be permitted to raise new arguments on appeal. The Tribes assert two new legal grounds (the Indian preemption doctrine and the Interstate Compact Clause) in support of their position. The Tribes claim that time restraints involved in pursuing the action limited the Tribes' ability to adequately brief and argue all legal theories at the trial court level.

This court previously has permitted an agency to argue new legal theories for nondisclosure on review of a public disclosure decision. In *Progressive Animal Welfare Soc'y (PAWS) v. University of Wash.*, 125 Wn.2d 243, 253, 884 P.2d 592 (1994), we allowed new grounds to be raised on review where the agency had had little time or opportunity to develop its legal position before being required to act, and where review was de novo. Similar reasons justify our consideration of the new arguments presented by the Tribes in this case.

### *Application of Freedom of Information Act*

■ Washington's public records act, sometimes called the state freedom of information act (hereafter the public records act or Act), is set forth at RCW 42.17.250-.348. The

Act requires all state and local agencies to disclose any "public record" upon request, unless the record falls within one of the statutory exemptions. *See PAWS*, 125 Wn.2d at 250; *State v. Maxfield*, 125 Wn.2d 378, 388, 886 P.2d 123 (1994); *Amren*, 131 Wn.2d at 31.

Approved by the voters in November 1972, the public disclosure act, which includes the public records act, was passed by popular initiative. LAWS OF 1973, ch. 1 (Initiative 276). The purpose of the public disclosure act is set forth in its first section as follows:

> It is hereby declared by the sovereign people to be the public policy of the state of Washington:
>
> . . . .
>
> (11) That, mindful of the right of individuals to privacy and of the desirability of the efficient administration of government, full access to information concerning the conduct of government on every level must be assured as a fundamental and necessary precondition to the sound governance of a free society.

RCW 42.17.010.

█ The public records act additionally provides in part:

> The people of this state do not yield their sovereignty to the agencies that serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may maintain control over the instruments that they have created.

RCW 42.17.251. *See also Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 127, 580 P.2d 246 (1978) ("The Washington public disclosure act is a strongly worded mandate for broad disclosure of public records."); *PAWS*, 125 Wn.2d at 251; *Maxfield*, 125 Wn.2d at 388.

██ In order to promote its purposes, the public record act's provisions are to be liberally construed to promote

full access to public records; its exemptions are to be narrowly interpreted. RCW 42.17.010(11), .251. *PAWS*, 125 Wn.2d at 251-52; *Amren*, 131 Wn.2d at 31.

The Tribes argue that the public records act should not apply in this case because the documents requested by Respondent Johnson are not public records or, if they are, they are exempt because they are trade secrets or are otherwise protected by application of the "other statute" exemption of the Act.[6]

■ A "public record," subject to disclosure under the Act

> includes [1] any writing [2] containing information relating to the conduct of government or the performance of any governmental or proprietary function [3] prepared, owned, used, or retained by any state or local agency regardless of physical form or characteristics . . . .

RCW 42.17.020(36). *See also Oliver v. Harborview Med. Ctr.*, 94 Wn.2d 559, 565, 618 P.2d 76, 26 A.L.R.4TH 692 (1980).

The Tribes do not dispute that the requested records are writings and that they are prepared, owned, used or retained by a state agency. However, the Tribes argue that the second element of the definition of public record is not met. They argue that the requested information relates solely to the functions of the Tribes, not to the conduct of Washington's government or the performance of any Washington governmental function.

In answering the threshold inquiry whether a document is a public record, this court broadly interprets this second element of the statutory definition of public record. For example, in *Dawson v. Daly*, 120 Wn.2d 782, 789, 845 P.2d 995 (1993), we held that documents compiled by a prosecutor for use in cross-examining a defense expert in child sexual abuse cases were documents relating to the perfor-

---

[6]The Tribes also initially claimed that the records related to a tax and, therefore, were exempt under RCW 42.17.310(1)(c)(ii). The Tribes abandoned this position during oral argument.

mance of prosecutorial functions, were used by the prosecutor's office in carrying out those governmental functions and, therefore, were public records. In *Servais v. Port of Bellingham*, 127 Wn.2d 820, 828, 904 P.2d 1124 (1995), we concluded that research data—a cash flow analysis prepared by a consulting firm, for purposes of planning by the Port—was a writing which related to the conduct and performance of a governmental function, and thus was a public record. In *Oliver*, 94 Wn.2d at 566, we held medical records of a patient treated at a public hospital were public records. We reasoned that the records contained information of a public nature, "*i.e.*, administration of health care services, facility availability, use and care, methods of diagnosis, analysis, treatment and costs, all of which . . . relate to the performance of a governmental or proprietary function." *See also Limstrom v. Ladenburg*, 85 Wn. App. 524, 529, 933 P.2d 1055, *review granted*, 133 Wn.2d 1001 (1997) (criminal investigation files held by prosecutor and prosecutor personnel files were public records).

■ In the present case, the records requested reflect the amount and distribution of the Tribes' "community contributions." These contributions are required to be paid by the Tribes pursuant to tribal-state compacts. The funds are used to defray the costs of the impact of Indian gambling operations on nontribal governmental agencies. The Gambling Commission is one of the governmental entities that participates in deciding which agencies should receive what portion of the funds.

Additionally, both the state Indian gaming compact law, RCW 9.46.360(9), and the compacts between Appellant tribes and the State give the Gambling Commission the power to enforce the provisions of the compact, including, presumably, the remission by the tribe of the community contribution. The Gambling Commission, on behalf of the State, also is charged with negotiating compacts and amendments to those compacts, including adjustments to the percentage of net win assessed as a community contribution. RCW 9.46.360. Records of contributions and the

costs of gambling impacts are necessary information to be used in negotiating compacts and their amendments.

The information does not, as the Tribes suggest, deal solely with the conduct of tribal government, with no relation to state governmental processes. The Gambling Commission negotiates, renegotiates and enforces the compacts on behalf of the citizens of Washington. Also, it is involved in distributing the community contributions to governmental agencies which are affected by the Tribes' gambling operations. In order to fulfill its obligations in this regard, the Gambling Commission must rely on and use the information contained in the records requested. The records relate to the conduct of the Gambling Commission and to its governmental functions. Therefore, the records are "public records" within the scope of the public records act.

The Tribes next argue that even if the court determines the Commission's compilations of community contributions are public records, the records are exempt from disclosure.

The public records act provides, in pertinent part:

> Each agency . . . shall make available for public inspection and copying all public records, unless the record falls within the specific exemptions of . . . RCW 42.17.310 . . . or other statute which exempts or prohibits disclosure of specific information or records.

RCW 42.17.260(1).

The Tribes first claim that the records are exempt from disclosure under Washington's Uniform Trade Secrets Act, RCW 19.108. *See* RCW 42.17.260(1) (excusing disclosure where "other statute" exempts disclosure). In *PAWS*, 125 Wn.2d at 262, this court held that the public records act may not be used to acquire knowledge of a trade secret. A "trade secret" is

> information, including a formula, pattern, compilation, program, device, method, technique, or process that:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily as-

certainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

RCW 19.108.010(4).

■■■ To be a trade secret, information must be shown to be "novel." *Machen, Inc. v. Aircraft Design, Inc.*, 65 Wn. App. 319, 325, 828 P.2d 73 (1992). *See also Buffets, Inc. v. Klinke*, 73 F.3d 965 (9th Cir. 1996) (interpreting Washington law, held a restaurant chain's recipes lacked the requisite novelty and economic value to be accorded trade secret status).

■■■ The Tribes bear the burden of proving the existence of a legally protectable trade secret. *Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 49, 738 P.2d 665 (1987); *Precision Moulding & Frame, Inc. v. Simpson Door Co.*, 77 Wn. App. 20, 25, 888 P.2d 1239 (1995).

Through general statements in declarations, the Tribes maintain that their competitors would gain an advantage over them if the amount of the two percent community contributions were made public. In the Tribes' view, a potential competitor could use the two percent figure to calculate gross revenue and then could gauge the market and market saturation. Therefore, the Tribes argue, the information derives economic value from not being generally known.

However, there is no evidence in the record before us that knowledge of a casino's profitability could not be generally ascertained by visiting the casino site, through newspaper articles about the casino,[7] or through employees, tribal members, or local service agencies which are recipients of community contributions. Even if the information were not readily ascertainable, there is no evidence

---

[7]Newspaper articles included in the record on review report specific figures as the estimated annual gross revenue of several Indian casino operations, including those of the four tribes involved in this appeal.

in the record to support the Tribes' contention that the information derives "independent economic value" from not being generally known.

We hold that the information sought to be protected here is not a "trade secret" under Washington law.

The Tribes also argue that the compacts themselves constitute "other statutes" which exempt the requested records from disclosure. As *PAWS* explained, the "other statutes exemption" applies only to exemptions which are explicitly set forth in another statute. *PAWS*, 125 Wn.2d at 262. In order to prevail on this claim, the Tribes would have to show that the compacts (1) explicitly exempt the Gambling Commission's records relating to community contributions from disclosure, and (2) that the compacts are statutes. The Tribes are unable to meet this burden.

Tribal-state gaming compacts are agreements, not legislation, and are interpreted as contracts. *See Confederated Tribes of Siletz Indians v. Oregon*, 143 F.3d 481, 485 (9th Cir. 1998) (the question whether public release of a state investigative report of an Indian casino should be enjoined could be resolved "through simple contract interpretation"); *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996).

The compacts between the Tribes and the State do not specifically address whether the amount of community contributions is subject to public disclosure. The Tribes claim the community contribution information is exempt from disclosure under a compact paragraph titled "Access to Records." Each of the compacts involved here includes a paragraph identical or similar to the following:

> Access to Records. Agents of the State Gaming Agency . . . shall have equal authority with the Tribal Gaming Agency to review and copy, during all operating hours, all Class III gaming records maintained by the Tribal gaming operation. Provided, that any copy thereof and any information derived therefrom, shall be deemed strictly confidential, and proprietary financial information of the Tribe. The State Gaming

Agency shall notify the Tribe of any requests for disclosure of such information and shall not disclose until the Tribe has had a reasonable opportunity to challenge the request. Provided, this public disclosure prohibition shall not apply to evidence used in any proceeding authorized by this Compact.

*See* Clerk's Papers at 33, 105, 189- 90, 301.

The information about Indian gaming to which the State has access under this paragraph is extensive. It goes far beyond the records requested in this case and could, conceivably, include information that would be exempt from disclosure under the public records act.

The Gambling Commission's position is that the records requested here are not gaming or casino records and, therefore, do not fall within the provisions of the "Access to Records" paragraph. Also, the Gambling Commission asserts that the compacts, on their own, do not—and could not—create exemptions beyond those contained in the public records act. *See Hearst*, 90 Wn.2d at 129-30 (agency has no authority to determine scope of exemptions set forth in the public records act); *Yakima Newspapers, Inc. v. City of Yakima*, 77 Wn. App. 319, 328, 890 P.2d 544 (1995) (agency could not agree that terms of a settlement agreement would be exempt from disclosure). The Gambling Commission additionally argues that the "Access to Records" paragraph specifically acknowledges the possibility that a request might be made for records relating to the duties regarding casino operations. That paragraph imposes duties on the Gambling Commission beyond those set forth in the public records act. Although the statute, RCW 42.17.330, gives an agency the *option* of notifying an affected party, the compact *requires* the Gambling Commission to notify the affected tribe of any request for records falling within the scope of the paragraph, and then to delay disclosure "until the Tribe has had a reasonable opportunity to challenge the request."

The Tribes, on the other hand, claim *any* information relating to tribal gaming is subject to the provision of the "Access to Records" paragraph. The Tribes argue that the

words "public disclosure prohibition" in the final proviso of the "Access to Records" paragraph, along with the recognition that the Tribes' gaming records are considered confidential and proprietary financial information, support an interpretation of the compact that prevents disclosure of any tribal records related to gambling activities. Citing *Berg v. Hudesman*, 115 Wn.2d 657, 667, 801 P.2d 222 (1990), the Tribes urge the court to read the compacts "contextually," according to the understanding of the Tribes as set forth in a declaration by the general manager of the Upper Skagit Tribe. In that declaration, the Tribes claim the disclosure proviso was added to the compacts in order to shift the financial burden of opposing disclosure from the Gambling Commission to the tribe. *Berg*'s adoption of the "context rule" was recently explained by this court in *In re Marriage of Schweitzer*, 132 Wn.2d 318, 937 P.2d 1062 (1997), to permit consideration of extrinsic evidence only to elucidate the meaning of the words of a contract, and not for the purpose of showing intention independent of the instrument. *Schweitzer* held that in *Berg*:

> We emphasized, "[i]t is the duty of the court to declare the meaning of what is written, and not what was intended to be written." *Berg*, 115 Wn.2d at 669 (quoting [*J.W. Seavey Hop Corp. v. Pollock*, 20 Wn.2d 337, 348-49, 147 P.2d 310 (1944)]). We accordingly held in *Berg* that parol evidence cannot be used to "add[ ] to, modify[ ], or contradict[ ] the terms of a written contract, in the absence of fraud, accident, or mistake." *Berg*, 115 Wn.2d at 669.

*Schweitzer*, 132 Wn.2d at 327.

The general manager's declaration is not necessary to determine the meaning of the terms of the compacts examined here.

Although the Tribes' interest in keeping some tribal gambling information confidential is clear from the compacts, the scope of that interest is not. We interpret the compacts to mean that the only records which fall under the "Access to Records" paragraph of the compact are casino or gaming records. The record on review does not

support a determination that the figure showing a tribe's community contribution is a gaming record or even that it was obtained by the Gambling Commission pursuant to the Access to Records paragraph. However, even if the community contribution were determined to be a casino or gaming record, the language of the compacts, particularly the reference to notification of the affected tribe if a request for public disclosure is made, supports the Gambling Commission's interpretation of the compacts. The compacts do not create a separate exemption for all Gambling Commission records which relate to Indian gaming activities. Instead, they impose upon the Gambling Commission an obligation to notify the affected tribe of any request for disclosure and then delay disclosure until the tribe has had an opportunity to challenge the request. The Gambling Commission complied with that obligation in this case.

We hold that Gambling Commission records showing the amount of a tribe's community contribution under the tribal-state gaming compacts involved in the present case are not exempt from disclosure under the terms of the compacts or under the public records act.

Because we hold the compacts do not prohibit disclosure of Gambling Commission records relating to community contributions, we need not consider the Tribes' arguments that (1) the compacts are "statutes" under the "other statutes" exemption of RCW 42.17.260(1); or (2) the compacts are binding on the State under the Interstate Compact Clause of the United States Constitution. U.S. Const. art. I, § 10, cl. 3.

### Application of IGRA and Federal Law Involving Indian Affairs

The Tribes argue that even if the Gambling Commission records which reflect the amounts of community contributions are subject to disclosure under the public records act, the records may not be disclosed without violating the IGRA or the doctrine establishing federal preemption over Indian affairs. *See Confederated Tribes of Siletz Indians,*

143 F.3d 481 (holding that a tribal-state compact governed the question of public disclosure of state records relating to Indian gaming operations and further holding that a preemption analysis in these circumstances is inappropriate).

The "doctrine" of federal preemption of Indian affairs prevents states from applying state law to tribal Indians on Indian reservations, without an express grant of authority from Congress. *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207, 107 S. Ct. 1083, 94 L. Ed. 2d 244 (1987). The Court explained that

> "[s]tate jurisdiction is pre-empted . . . if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." [*New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334, 103 S. Ct. 2378, 76 L. Ed. 2d 611 (1983)]. The inquiry is to proceed in light of traditional notions of Indian sovereignty and the congressional goal of Indian self-government, including its "overriding goal" of encouraging tribal self-sufficiency and economic development. [*Mescalero*, 462 U.S. at 334-35].

*Cabazon*, 480 U.S. at 216 (footnote omitted).

In *Cabazon*, the Court initially noted that no federal statute governed state involvement in Indian tribal gambling activities at that time. It then balanced the interests of the tribe, the federal government and the State of California before determining that the state's interest in preventing anticipated crime did not justify state regulation of tribal bingo enterprises in light of the compelling federal and tribal interests supporting them.

 Following *Cabazon*, Congress passed the IGRA. Where Congress passes a law governing tribal affairs in a certain area, the inquiry is designed to determine whether, in the specific context, the exercise of state authority would violate federal law. *See, e.g., White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 145, 100 S. Ct. 2578, 65 L. Ed. 2d 665 (1980).

In enacting the IGRA, legislative history shows Congress recognized that both state and tribal governments had significant governmental interests in the operation of class III gaming activities. S. Rep. No. 100-446 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3083. Neither the federal government nor the tribal government had systems in place for regulating class III gaming. "Thus a logical choice is to make use of existing State regulatory systems . . . . The use of State regulatory systems can be accomplished through negotiated compacts." 1988 U.S.C.C.A.N. at 3083-84.

As stated above, the IGRA provides the compacts may include provisions addressing:

> (i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

> (ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

> (iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;

> . . . .

> (vii) any other subjects that are directly related to the operation of gaming activities.

25 U.S.C. § 2710(d)(3)(C).

The question in the present case is whether a state law requiring a state agency to disclose the amount of a tribe's community contribution violates federal law. If the application of the public records act is incompatible with tribal and federal interests, as set forth in the IGRA, then application of the Act would violate federal law.

The IGRA was enacted to enable Indian tribes to engage in gaming activities as a means of generating tribal governmental revenue. 25 U.S.C. § 2701(1). "[A] principal

goal of Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government." 25 U.S.C. § 2701(4).

The Tribes involved in this case argue that application of the public records act to the Tribes' gaming operations violates the IGRA because the Act does not directly relate to the operation of gaming activities and was not expressly mentioned in the compact.

The public records act does not apply to the records of tribal governments or to those of tribal gaming operations.

The request for records in this case was directed to the Gambling Commission, not the Tribes, and asked for disclosure of records of the Commission, not the Tribes or their casinos. The request for records showing the amount of community contributions received and distributed has a direct bearing on the Gambling Commission's performance of its job. The records requested were not tribal records which concerned on-reservation conduct involving only Indians but, rather, concern tribal contributions to non-tribal governmental agencies impacted by reservation gambling activities. The records directly reflect on the Gambling Commission's performance in enforcing the tribal-state compacts and on the reimbursement for obvious impacts of gambling operations.

Additionally, the Tribes have presented no real evidence of adverse impact as a result of the disclosure to any tribe, including those whose community contribution amounts have been released.

■ We hold that the application of the public records act is not contrary to the goals of tribal self-government or tribal self-sufficiency. *See Confederated Tribes of Siletz Indians*, 143 F.3d 481. The IGRA was not intended to diminish the right of state citizens to monitor, through requests for information, the performance of public servants in state agencies. Therefore, we hold the IGRA does not preempt application of the public records act to records held by the Gambling Commission showing the amounts of community contributions made and disbursed under tribal-state compacts.

*Attorney Fees*

Respondent Johnson requests attorney fees, penalties and expenses, pursuant to RCW 42.17.340, or for attorney fees pursuant to equitable principles governing injunction actions.

 The public records act authorizes an award of attorney fees and costs in the following section:

> Any person who prevails *against an agency in any action in the courts seeking the right to inspect or copy any public record* or the right to receive a response to a public record request within a reasonable amount of time shall be awarded all costs, including reasonable attorney fees, incurred in connection with such legal action. In addition, it shall be within the discretion of the court to award such person an amount not less than five dollars and not to exceed one hundred dollars for each day that he was denied the right to inspect or copy said public record.

RCW 42.17.340(4) (emphasis added).

The Court of Appeals has interpreted this section to be inapplicable to cases in which an individual—rather than the agency—opposes disclosure of the records, and where the action was brought to prevent, rather than compel, disclosure. *Yakima Newspapers,* 77 Wn. App. at 329. This interpretation is consistent with the purpose of the attorney fees provision, which is to encourage broad disclosure and to deter agencies from improperly denying access to public records. *Lindberg v. Kitsap County,* 133 Wn.2d 729, 746, 948 P.2d 805 (1997). This provision does not authorize an award of attorney fees in an action brought by a private party, pursuant to RCW 42.17.330, to prevent disclosure of public records held by an agency where the agency has agreed to release the records but is prevented from doing so by court order. Mr. Johnson prevailed against the Tribes, not against the agency.

 We also hold that Mr. Johnson is not entitled to attorney fees based on an unreasonable delay on the part of the Gambling Commission. RCW 42.17.330 establishes the

right of persons impacted by the disclosure of public records to seek an injunction prohibiting or limiting the disclosure. It also provides that an agency which receives a request for a public record

> has the option of notifying persons named in the record or to whom a record specifically pertains, that release of a record has been requested. However, this option does not exist where the agency is required by law to provide such notice.

Here, the Gambling Commission had the right and, under the compacts at that time, arguably, had the obligation to provide notice to the Tribes that information had been requested by Mr. Johnson. Implicit in the statutory right to seek an injunction to prevent disclosure is a realistic opportunity to apply to the trial court for such an order. Any delay on the part of the Gambling Commission in turning over the records to Mr. Johnson was based on a recognition of this right and, under the circumstances presented here, was reasonable.

 ██ Mr. Johnson also argues that attorney fees are required where an injunction improperly blocks disclosure of a public record. The applicable equitable rule is that attorney fees *may* be awarded to a party who prevails in dissolving a wrongfully issued injunction or, as here, temporary restraining order. *Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 143, 937 P.2d 154, 943 P.2d 1358 (1997), *cert. denied*, 522 U.S. 1077 (1998); *Seattle Fire Fighters Union, Local 27 v. Hollister*, 48 Wn. App. 129, 138, 737 P.2d 1302 (1987). The award is discretionary, and Mr. Johnson does not argue that the trial court abused its discretion in denying him his fees. The purpose of the rule permitting recovery for dissolving a restraining order is to deter plaintiffs from seeking relief prior to a trial on the merits. *Ino Ino*, 132 Wn.2d at 143. The purpose of the rule would not be served where injunctive relief prior to trial is necessary to preserve a party's rights pending resolution of the action. Here, the trial on the merits would have been fruitless if the records had already been disclosed. If fees were

to be awarded based on this equitable rule, they would be limited to those necessary to dissolve the temporary restraining order, not those connected with the appeal. *See Ino Ino*, 132 Wn.2d at 144.

The stays issued in this court and in the Court of Appeals were granted pursuant to RAP 8.3. That rule authorizes an appellate court to stay a trial court order if the moving party can demonstrate that debatable issues are presented on appeal and that the stay is necessary to preserve the fruits of the appeal for the movant, after considering the equities of the situation. *Boeing v. Sierracin Corp.*, 43 Wn. App. 288, 291, 716 P.2d 956 (1986). If the harm occasioned by the appellate delay can be measured in terms of a monetary amount, then a bond is appropriate. *Boeing*, 43 Wn. App. at 292. The Court of Appeals Commissioner in the present case ordered the Tribes to post a bond, and that bond was apparently posted. This court later determined that the issues presented by the Tribes were debatable and that a stay was necessary in order to preserve the fruits of the appeal, should the Tribes prevail. Mr. Johnson has not alleged or demonstrated any harm, monetary or otherwise. Mr. Johnson has not developed an argument upon which we can make a decision on the bond, and we do not.

Mr. Johnson's request for fees and penalties is denied.

Affirmed.

Durham, C.J., and Dolliver, Smith, Johnson, and Talmadge, JJ., concur.

Madsen, J. (concurrence/dissent) — An award of attorney fees is mandatory under RCW 42.17.340(4). I dissent from the majority's holding denying costs, including attorney fees, to Mr. Johnson.

RCW 42.17.340(4) states that "[a]ny person who prevails against an agency in any action [seeking public disclosure] *shall be awarded all costs, including reasonable attorney fees . . . .*" (Emphasis added.) The court recently confirmed

the mandatory nature of a costs and fees award under this provision. *Amren v. City of Kalama*, 131 Wn.2d 25, 35, 929 P.2d 389 (1997); *see also Progressive Animal Welfare Soc'y v. University of Wash.*, 114 Wn.2d 677, 686, 790 P.2d 604 (1990); *accord Doe I v. Washington State Patrol*, 80 Wn. App. 296, 302, 908 P.2d 914 (1996).

The majority cites *Yakima Newspapers, Inc. v. City of Yakima*, 77 Wn. App. 319, 329, 890 P.2d 544 (1995) for the proposition that RCW 42.17.340(4) does not apply where an individual rather than an agency opposes disclosure of the records, and where the action was brought to prevent rather than compel disclosure. The majority says that Mr. Johnson prevailed against the Tribes, not the agency.

I cannot agree that Mr. Johnson did not prevail against the agency. Moreover, the majority gives an incomplete, and erroneous, explanation of *Yakima Newspapers*.

In *Yakima Newspapers*, a newspaper sought disclosure of a settlement agreement terminating a dispute between Yakima and its former fire chief. The former fire chief opposed disclosure. The trial court ordered disclosure, following which the newspaper and the city agreed to entry of a stipulated order of dismissal. The former fire chief appealed. The city did not appeal and was not a party to the appeal. On appeal, the newspaper sought attorney fees for the *appeal* from the former fire chief. Because an individual opposed the disclosure on appeal, and not an agency, the Court of Appeals held that the statute did not allow for an attorney fee award.[8] *Yakima Newspapers*, 77 Wn. App. at 329-30. This reasoning is correct, because the newspaper did not "prevail[] against an agency" on the appeal, as RCW 42.17.340(4) requires for an award of costs and fees, because no agency even participated in the appeal.

However, in this case Mr. Johnson seeks attorney fees for the entire litigation, not just on appeal. Resp't Johnson's Br. at 46-47. Unlike *Yakima Newspapers*, here the party

---

[8]The court also rejected the newspaper's reliance by analogy on wrongful injunction cases. *Yakima Newspapers, Inc. v. City of Yakima*, 77 Wn. App. 319, 329, 890 P.2d 544 (1995).

seeking disclosure prevailed in superior court against the agency, which did not immediately release the records sought.[9] Further, any delay in disclosure based upon terms of the compact does not justify denying the costs and fees mandated by the statute. *See Amren*, 131 Wn.2d at 35 (rejecting the argument that a reasonable basis in law for withholding disputed records is a valid basis for a denial of attorney fees under RCW 42.17.340(4)).

If the Legislature elects to change the statute, a different question may be presented. However, under the present statute, an agency's reliance upon a source outside the statute and not recognized by it as a basis for an exception to the mandatory costs and fees requirement has the potential to significantly undermine the purposes of the public disclosure laws.

Because costs, including attorney fees, are mandatory under RCW 42.17.340(4), I dissent from that portion of the majority opinion denying costs and fees to Mr. Johnson. Otherwise, I concur in the majority's decision.

ALEXANDER and SANDERS, JJ., concur with MADSEN, J.

Reconsideration denied September 2, 1998.

---

[9]The agency is a party to the appeal, but takes no position on the various exemptions to required disclosure claimed by the appellant tribes. Resp't State's Br. at 8.