IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JAMES J. PALLOTTA, | ) | No. 80011-6-I |
| | ) | |
| Appellant, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JULEP BEAUTY, INC., a Washington for-profit corporation, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

HAZELRIGG, J. — James Pallotta seeks reversal of summary judgment in favor of Julep Beauty, Inc., arguing that he was owed a premium payment on his investment before Julep merged with Glansaol Management, Inc. Because a majority in interest of investors successfully amended all of the promissory notes to waive the premium, Pallotta was not entitled to the premium payment. We affirm.

## FACTS

James Pallotta is an investor who operates in part through Raptor Holdings LP. An employee of Pallotta's, Joshua Langsam, testified that investments were sometimes made under Pallotta's name and sometimes made under the name of Raptor but "[t]he two are largely one [and] the same." In his individual capacity,

Pallotta first invested in Julep Beauty, Inc., a Washington company founded by Jane Park, in 2010.

In 2015, Julep required additional financing and imposed a "pay to play provision" on professional investors who held preferred stock in the company. These investors would be required to choose between an additional contribution of a pro rata share relative to their preferred equity stake or conversion of their preferred shares to common stock. Pallotta was identified as a professional investor and chose to invest additional funding. In July 2015, Pallotta executed a Note Purchase Agreement ("the Agreement") with Julep, agreeing to purchase a subordinated convertible promissory note ("the Note") from Julep.

The Note provided that Julep promised to pay Pallotta $234,288.01 plus "interest . . . on the unpaid principal balance at a rate equal to 5% per annum, computed on the basis of the actual number of days elapsed and a year of 365 days." The unpaid principal, accrued interest, and "other amounts payable hereunder" would be due and payable on the earlier of the date of maturity, July 14, 2016, or when declared or made automatically due and payable on an "Event of Default." The Note listed the occurrences that would constitute such an event, including "Failure to Pay:"

> The Company shall fail to pay (i) when due any principal payment on the due date hereunder or (ii) any interest payment or other payment required under the terms of this Note or any other Transaction Document on the date due and such payment shall not have been made within five (5) business days of the Company's receipt of written notice to the Company of such failure to pay."

If an event of default other than bankruptcy or insolvency proceedings occurred, the investor would have the right to declare all outstanding obligations due and

payable by written notice to Julep and with the written consent of a majority in interest of investors. In addition, "[d]uring any period in which an Event of Default has occurred and is continuing, the Company shall pay interest on the unpaid principal balance hereof at a rate per annum equal to the rate otherwise applicable hereunder plus ten percent."

The section of the Note entitled "Payments" contained three subsections: interest, voluntary prepayment, and mandatory prepayment. The interest subsection simply stated that "[a]ccrued interest on this Note shall be payable at maturity." Section 1(c) provided for a mandatory prepayment before the date of maturity in one specific circumstance:

> In the event of a Liquidation Transaction, the outstanding principal amount of this Note, plus all accrued and unpaid interest, in each case that has not otherwise been converted into equity securities pursuant to Section 4, shall be due and payable immediately prior to the closing of such Liquidation Transaction, together with a premium equal to 100% of the outstanding principal amount to be prepaid.

The Note contained a provision allowing changes under certain circumstances:

> "Any provision of this Note may be amended, waived or modified upon the written consent of the Company and a Majority in Interest of Investors; provided, however, that no such amendment, waiver or consent shall (i) reduce the principal amount of this Note without Investor's written consent, or (ii) reduce the rate of interest of this Note without Investor's written consent."

A "Majority in Interest of Investors" was defined as "Investors holding more than 50% of the aggregate outstanding principal amount of the Notes." The Agreement contained a nearly identical waiver and amendment provision allowing a change to "this Agreement and the Notes" under the aforementioned conditions. It

contained one additional sentence stating that "[a]ny amendment or waiver effected in accordance with this paragraph shall be binding upon all of the parties hereto."

The Note also contained a "pari passu" provision guaranteeing equal treatment among the noteholders:

> Investor acknowledges and agrees that the payment of all or any portion of the outstanding principal amount of this Note and all interest hereon shall be pari passu in right of payment and in all other respects to any other Notes. In the event Investor receives payments in excess of its pro rata share of the Company's payments to the holders of all of the Notes, then Investor shall hold in trust all such excess payments for the benefit of the holders of the other Notes and shall pay such amounts held in trust to such other holders upon demand by such holders.

(Emphasis omitted).

The parties extended the maturity date of the Note past the original July 14, 2016 date. Julep again encountered financial difficulties and began to explore possible merger opportunities in late 2016. In advance of a potential acquisition, Julep distributed a Note Cancellation Agreement to each of the noteholders, including Pallotta. The Note Cancellation Agreement provided that Julep would pay the noteholder the outstanding principal balance on their Note and interest accrued through September 30, 2016 "[u]pon the closing of the Merger." Under the Note Cancellation Agreement, the noteholder agreed that this payment would satisfy all obligations owed to them by Julep and waived "any right to additional payment with respect to the Note, including but not limited to pursuant to Section 1(c) thereof." On December 16, 2016, Julep entered into Note Cancellation

Agreements with 26 of the 27 noteholders. Pallotta did not sign his Note Cancellation Agreement.

On December 20, 2016, Julep and four of the noteholders, who represented a majority in interest of the investors, executed an "Amendment to Subordinated Convertible Promissory Notes" ("the Amendment"). This document amended each of the Notes issued under the July 14, 2015 Agreements to delete section 1(c), the provision that obligated Julep to pay a premium in the event of a liquidation transaction. The Amendment stated that it was effective "as of closing of the merger." Pallotta was not a signatory to the Amendment. The articles of merger were filed with the Secretary of State later that day.

On January 6, 2017, Pallotta sent a letter to Park asserting that the Amendment was ineffective as to his Note and demanding payment of the outstanding principal, accrued interest of 5 percent through the maturity date, default interest of 15 percent from the maturity date to the date of the letter, and the premium of 100 percent of the outstanding principal amount. Pallotta was paid 100 percent of the principal on the Note and the accrued interest through December 20, 2016. He also "received his share of the merger consideration relating to his equity holdings."

Because Pallotta maintained that he was owed further payment, Julep sought a declaratory judgment in King County Superior Court. The parties agreed that there were no material facts in dispute and each filed motions for summary judgment. The court granted summary judgment in favor of Julep. The court determined that "Pallotta is owed no Premium, additional interest, default interest

under the Pallotta Note, or payment of any kind under the Pallotta Note." The court also found that Pallotta would have to hold 96.7 percent of any additional payout under his Note in trust for fellow noteholders. Pallotta appealed.

ANALYSIS

We review an appeal of summary judgment de novo, performing the same inquiry as the trial court and viewing all facts and reasonable inferences therefrom most favorably toward the nonmoving party. Lybbert v. Grant County, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). "Summary judgment is proper only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Int'l Marine Underwriters v. ABCD Marine, LLC, 179 Wn.2d 274, 281, 313 P.3d 395 (2013); See also CR 56(c). A fact is material if the outcome of the litigation depends on it in whole or in part. Kries v. WA-SPOK Primary Care, LLC, 190 Wn. App. 98, 117, 362 P.3d 974 (2015).

I.     Meaning of "Rate of Interest"

Pallotta contends that the Amendment did not waive his right to receive the premium because the premium constituted interest under the Note, the rate of which could not be reduced without his individual consent. When interpreting a contract, we are "'giv[ing] a meaning to the symbols of expression used by another person.'" Berg v. Hudesman, 115 Wn.2d 657, 663, 801 P.2d 222 (1990) (quoting 3 A. Corbin, Contracts § 532 (1960)) (alterations in original). The purpose of contract interpretation is to ascertain the intent of the contracting parties. Id. To do so, we consider "the contract as a whole, the subject matter and objective of

the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties." Id. at 667 (quoting Stender v. Twin City Foods, Inc., 82 Wn.2d 250, 254, 510 P.2d 221 (1973)). Extrinsic evidence may be used only to elucidate the meaning of the words in a contract, not to add to, modify, or contradict the terms of the contract to comport with what the parties intended to write. Confederated Tribes of Chehalis Reservation v. Johnson, 135 Wn.2d 734, 752, 958 P.2d 260 (1998).

"Summary judgment on an issue of contract interpretation is proper when the parties' written contract, viewed in light of the parties' other objective manifestations, has only one reasonable meaning." Kries, 190 Wn. App. at 119. If two or more meanings are reasonable, the meaning of the provision is a question of fact. GMAC v. Everett Chevrolet, Inc., 179 Wn. App. 126, 135, 317 P.3d 1074 (2014). "We generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 504, 115 P.3d 262 (2005). When terms are used separately and consistently throughout a contract, they are presumed to have separate meanings. See Bellevue Sch. Dist. No. 405 v. Bentley, 38 Wn. App. 152, 159, 684 P.2d 793 (1984).

Pallotta contends that the trial court erred in interpreting the term "interest" as used in the Note not to include the premium. "Interest" and "rate of interest" are not defined in the Note. Pallotta argues that the premium falls under the following dictionary definition of "interest:" "[t]he compensation fixed by agreement or

allowed by law for the use or detention of money, or for the loss of money by one who is entitled to its use; esp[ecially], the amount owed to a lender in return for the use of borrowed money." BLACK'S LAW DICTIONARY (10th ed. 2014). "Interest" is also defined as "the price paid for borrowing money generally expressed as a percentage of the amount borrowed paid in one year." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1178 (2002). Similarly, an "interest rate" is defined as "[t]he percentage that a borrower of money must pay to the lender in return for the use of the money, usu[ally] expressed as a percentage of the principal payable for a one-year period. — Often shortened to rate." BLACK'S LAW DICTIONARY (10th ed. 2014) (emphasis omitted). A "premium" is "[a] sum of money paid in addition to a regular price, salary, or other amount; a supplemental amount of money above the normal or standard rate." BLACK'S LAW DICTIONARY (10th ed. 2014).

The Note provides that the "rate of interest of this Note" may not be reduced without the individual investor's consent. Pallotta contends that the premium "applies a rate, expressed as a percentage applied to the outstanding principal[,] and requires that Julep pay the rate as a condition of Pallotta's promise to lend Julep Pallotta's money." However, this is not true in every instance. Under the terms of the Note, payment of the premium is not necessarily required in return for allowing Julep to use Pallotta's money. The premium only becomes due in the event of a liquidation transaction. Additionally, although the amount of the premium is expressed as a percentage of the outstanding principal, it is not tied to any unit of time. The premium is a supplemental payment owed in addition to the outstanding principal and accrued interest in the event of a liquidation transaction.

The premium is referenced few times in the Note, presumably because of the limited circumstance in which it would arise. However, in the Note's "Definitions" section, the meaning of "Senior Indebtedness" includes the phrasing: "the principal of (and premium, if any), unpaid interest on and amounts reimbursable, fees, expenses, costs of enforcement and other amounts due." Although apparently not referencing the premium set out under this Note, the distinction between a premium and interest indicates that the parties understood these terms to reference two separate categories of payment.

Even viewing all facts in favor of Pallotta, the only reasonable interpretation of the term "interest" in the Note does not include the premium due in the event of a liquidation transaction. Because waiving the premium did not reduce the rate of interest on the Note, Pallotta's individual consent was not required to waive the provision.

II. Effectiveness of Waiver

We next consider whether Pallotta's right to receive the premium was effectively waived. Julep argues that the execution of the Note Cancellation Agreements and the Amendment by a majority in interest of the investors were a "belt and suspenders" approach to his intransigence and were each sufficient to waive Pallotta's entitlement to the premium.

We need not address the effect of the Note Cancellation Agreements on Pallotta's Note because the Amendment effectively waived Pallotta's contractual right to the premium. As noted above, because the premium was not "interest" under the terms of the Note, Pallotta's individual consent was not required to

amend, waive, or modify the prevision for the premium if Julep and a majority in interest of investors consented in writing to the change. The parties agree that the written Amendment waiving the premium for all noteholders was signed by Park as CEO of Julep and by a majority in interest of investors.

Pallotta contends that the waiver of the premium failed because the premium became due before the Amendment became effective. Under the terms of the Note, the premium became due "immediately prior to closing" of a liquidation transaction. By the terms of the Amendment, the section of the Note providing for the premium was deleted "as of closing" of the merger.

Under the plain language of the Note, the requirement to pay the premium "immediately prior to closing" meant that Julep had up until the moment of closing to make the payment and was not in breach until the moment of closing. The Amendment became effective at the moment of closing. At the moment that the merger closed, when Julep would have breached the mandatory prepayment provision, that provision was simultaneously removed from the contract. A party cannot breach a provision that does not exist. Additionally, as Julep points out, Pallotta does not give any reason that the premium could not be waived after it became due.

Because a majority in interest of the investors successfully amended all of the Notes to delete the provision requiring the premium, Pallotta is not owed the premium even though he did not individually consent to the Amendment. The trial court did not err in granting summary judgment for Julep.[1]

---

[1] Pallotta also assigns error to the trial court's order that he could be required to hold 96.7 percent of any additional payment in trust for the other noteholders, but he does not argue this

Affirmed.

WE CONCUR:

---

assignment in his opening brief. "A party that offers no argument in its opening brief on a claimed assignment of error waives the assignment." Brown v. Vail, 169 Wn.2d 318, 336 n. 11, 237 P.3d 263 (2010). Accordingly, to the extent that it is distinct from the trial court's grant of summary judgment, we decline to address this alleged error.